## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JACK TALBOT MORRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-0073-CVE-JFJ** |
| | ) | |
| **CITY OF TULSA,** | ) | |
| **JOSHUA E. DUPLER,** | ) | |
| **ANTHONY FIRST, and** | ) | |
| **KURT DODD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are Defendants Joshua Dupler's, Anthony First's, and Kurt Dodd's Motion for Summary Judgment and Brief in Support (Dkt. # 50) and Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support (Dkt. # 51).[1]  The individual defendants argue that the amount of force they used to arrest plaintiff Jack Talbot Morris was objectively reasonable, and they claim that it was Morris who initiated a physical confrontation with police officers.  Dkt. # 50.  The City of Tulsa (the City) argues that the amount of force used was reasonable and plaintiff cannot identify an official policy or custom that caused the alleged constitutional violation.  Dkt. # 51.  Plaintiff responds that police officers violated his Fourth Amendment rights by using excessive force to effect a misdemeanor arrest, and the City's policy for reviewing use of force incidents shows deliberate indifference to the rights of citizens who come into contact with police officers.  Dkt. ## 71, 72.

---

[1]    Defendants have also filed motions in limine (Dkt. ## 54, 55, 56, 57, 58), but those motions will not be considered in this Opinion and Order.

**I.**

On August 16, 2017, Tulsa Police Department (TPD) officers were searching for a suspect who had fled from a stolen vehicle near a QuikTrip store located at 4950 South Harvard Avenue in Tulsa, Oklahoma.  Dkt. # 50-3, at 3.  Officers quickly apprehended a passenger in the stolen vehicle, but the driver fled on foot and officers sought to establish a perimeter to capture and arrest the driver. Id.  TPD Officer Joshua Dupler pursued the driver on foot west toward a parking lot that was north and west of the QuikTrip, and he does not recall that the suspect fled into a nearby pasture.[2]  Dkt. # 71-2, at 4-5.  Numerous other TPD Officers were also participating in the search for the suspect, including TPD Officers Edmond Parrish and Israel Rodriguez, and Parrish saw the suspect run toward a barn.  Dkt. # 71-3, at 5.  Parrish briefly lost sight of the suspect and was initially unsure if the suspect entered the barn, but he regained sight of the suspect running east and he chased the suspect heading away from the barn.  Id.  TPD Officer Kurt Dodd arrived on the scene and spoke to a resident who lived nearby, Mohsen Pourett, and the Court has been provided two different accounts of Pourett's statements to Dodd.  Dodd recalls that Pourett said "I saw the guy in the red shirt run across my lawn and toward the barn."  Dkt. # 50-9, at 5.  Pourett testified at his deposition that he

---

[2]     The Court notes that this description of the events comes from Dupler's deposition testimony, and defendants have offered affidavits in support of their motions for summary judgment that contain statements that appear to contradict the deposition testimony. Plaintiff asks the Court to consider the deposition testimony, rather than the affidavits, to determine the existence of a genuine dispute of material fact. Dkt. # 71, at 8.  The Court finds that it would be preferable to rely on deposition testimony whenever possible, because plaintiff's arguments could reasonably be construed as a request to disregard the affidavits as sham affidavits. The Court will consider statements in the affidavits to the extent the statements are undisputed or clarify confusing aspects of deposition testimony, but the Court will rely on deposition testimony in the case of contradictory statements in an effort to avoid the issue of sham affidavits.  See Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).

spoke to a police officer, and Pourett remembers telling the officer that he saw someone running past his house. Dkt. # 71-4, at 3. However, Pourett told the officer that he lost sight of the person and did not know where the person had gone. Id. Rodriguez and Dodd approached the barn and they recall seeing a horse run out of the barn, and this led them to believe that the suspect could be in the barn. Dkt. # 50-9, at 5; Dkt. # 50-12, at 2-3.

TPD Officer Barnhart arrived at the barn in his patrol car and his patrol car recorded dash cam footage showing the barn and the surrounding area. Dkt. # 71-5 (dash cam footage). When Barnhart arrived, a horse can be seen standing behind the barn, and there is a small pasture or field in front of the barn that is surrounded by a fence. The horse became startled and began running around the field just before Barnhart jumped over the fence and entered the barn. Another TPD vehicle was parked on the opposite side of the fence from Barnhart's patrol car, and another TPD officer can be seen standing outside of the barn while Barnhart searched the interior. The video shows one officer walking around the exterior of the barn while one officer searched the interior of the barn, and it appears that neither officer found the suspect. A third officer can be seen approaching the barn while the search is ongoing. Barnhart returned to his patrol car after about two minutes of searching, and the horse continued to run around the field while officers were searching in and around the barn.

Dodd claims that he refrained from immediately entering the barn, because the barn appeared to be cluttered and he believed it would be dangerous to enter the barn if the suspect were armed. Dkt. # 50-9, at 5. TPD Officer Anthony First arrived at the barn in his marked patrol car, and he claims that a white pickup truck was driving aggressively behind him. Dkt. # 50-6, at 4-5. Dodd states that Dupler and First assumed positions between the barn and a nearby apartment complex,

but First testified in his deposition that he was north of the field. Dkt. # 71-6, at 3. Morris got out

of the white pickup truck as TPD officers set up a perimeter around the barn, and he began to open

a gate near the barn. Dkt. # 50-3, at 4. Several of the officers ordered Morris to move away from

the gate because a suspect could be in the barn, but Morris disputes that officers told him the nature

of the crime the suspect allegedly committed or that the suspect could be armed. Dkt. # 50-6, at 5;

Dkt. # 71-1, at 6. Morris claims that he told the officers that he needed to calm his horse and he had

no intention of entering the barn, and he did not understand what the officers meant when they told

him he was not complying with their commands. Dkt. # 71-1, at 5. The officers state that Morris

swore at them and refused to comply with commands to step away from the gate. Dkt. # 50-3, at 4;

Dkt. # 50-6, at 5-6; Dkt. # 50-12, at 3. Dupler, First, and Dodd claim that Morris became hostile as

they were attempting to de-escalate the situation, but Morris claims that the officers were yelling at

him and that he did not engage in hostile behavior towards them. Dkt. # 50-3, at 4-5; Dkt. # 50-6,

at 5-6; Dkt. # 71-1, at 7-8. Morris denies that he refused to comply with commands issued by First,

and he states that he walked back through the gate toward the officers in compliance with First's

command. Dkt. # 71-1, at 7-8.

   The parties have offered completely divergent evidence concerning the events that occurred

after Morris stepped through the gate toward the police officers. The officers have submitted

affidavits stating that Morris approached First with balled fists and an aggressive demeanor, and First

believed that Morris intended to assault him. Dkt. # 50-6, at 7. All three officers agree that First

initiated physical contact with Morris, and First states that he put his hands on Morris' chest in

attempt to move Morris toward his right side. Dkt. # 50-6, at 7. Dodd thought that First was trying

to take Morris into custody, and he saw First grab Morris and try to pull him away from the gate.

Dkt. # 50-9, at 7.  Dupler heard yelling and he saw First take hold of Morris, and he states that Morris tried to pull away from First.  Dkt. # 50-3, at 5.  First used his OC spray on Morris and the spray hit the side of Morris' face, but First and Dupler state that the spray had little effect on Morris. Dkt. # 50-3, at 5; Dkt. # 50-6, at 7.  First took Morris to the ground and Morris rolled onto his stomach, and First and Dupler both state that Morris purposefully buried his hands underneath his body.  Id.  First states that he ordered Morris to show his hands, but Morris refused to obey his commands.  Dkt. # 50-6, at 7.  Dupler and Dodd arrived to assist First in an attempt to gain control of Morris, and all three officers were wrestling with Morris and ordering him to stop resisting their attempts to arrest him.  Dkt. # 50-3, at 5; Dkt. # 50-6, at 7-8; Dkt. # 50-9, at 7.  All three officers state that Morris was very strong and Morris was able to push himself off the ground with three officers on his back, and he continued to resist efforts by the officers to gain control over his hands. Dkt. # 50-6, at 8.  Morris then started to throw his arms and head back in an attempt to dislodge the officers, and he struck Dupler in the head near Dupler's left temple.  Dkt. # 50-3, at 5-6.  Dupler states that he struck Morris with a high force strike to the right side of Morris' face.  Dkt. # 50-3, at 6.  The purpose of the strike was to cause Morris to reach for his head to allow the officers to gain control over Morris' hands.  Dkt. # 50-3, at 6; Dkt. # 50-9, at 8.  Morris continued to struggle and he again tried to push himself up off the ground with all three officers on his back.  Dkt. # 50-3, at 6.  Dupler states that he struck Morris with three or four medium velocity strikes to the back of the head, and this caused Morris to raise one of his hands.  Dkt. # 50-3, at 6.  Morris continued to struggle but the officers were eventually able to handcuff Morris using two sets of handcuffs.  Dkt. # 50-3, at 7; Dkt. # 50-6, at 9.

Morris offers a different version of the events after he stepped through the gate. Morris testified in his deposition that First asked him to walk towards a parked vehicle, and First reached out and tried to grab Morris' shirt. Dkt. # 71-1, at 9. Morris does not deny that he was angry that police officers were preventing him from calming his horse that was inside the fence or that he used obscene language when talking to them, but he disputes First's claims that he approached First with balled fists and an aggressive demeanor. Id. at 9-11. First lost his grip on Morris' shirt and slipped, and Morris walked away after First fell to the ground. Id. at 9. Morris states that he was confused by First's actions, because he complied with First's request to come through the gate and First assaulted him without provocation. Id. at 14-15. First then used his pepper spray and the spray landed on right side of Morris' face, and Morris staggered as he attempted to use shirt to wipe off the pepper spray. Id. at 16-17. First jumped on Morris' back and took him to the ground. Id. at 18. Morris testified that he sat up on his hands and knees and told First that he was "done." Id. Morris does not recall that any officer issued a command for him to put his hands behind his back. Id. First and another officer pinned Morris to the ground, and Morris claims that his left arm was broken at this point in the encounter. Id. at 19. Morris states that multiple police officers were on his back pinning him to the ground and he denies that his hands were underneath his body in a position where a weapon could have been hidden. Id. at 19-20. Morris claims that Dupler pulled his head back and struck him several times in the head while other officers kept him pinned to the ground. Id. at 21. Morris disputes Dupler's assertion that there was any pause between the strikes to the head, and he claims that he was struck multiple times in the face and head in quick succession. Id. at 22. Morris was eventually placed in handcuffs, but he states that he was not aware that officers used two sets of handcuffs until he read the police report. Id. at 24-25. Morris also claims that he was not told that

6

he was under arrest after he was handcuffed.  Id. at 25.  Morris was taken to St. John Medical Center in an ambulance, and he was diagnosed with a fractured left elbow, a lacerated right eyebrow, and several contusions to the face.  Dkt. # 71-1, at 3.

On August 16, 2017, Morris was arrested on two counts of assault and battery on a police officer and charges of obstruction and resisting arrest.  Dkt. # 50-1, at 2.  The parties have not attached a copy of the charging document filed by the Tulsa County District Attorney, but they do not dispute that defendant later pled guilty to misdemeanor charges of obstructing an officer and resisting an officer.  Dkt. # 50, at 9-10; Dkt. # 71, at 5.  Morris states that he would not have pled guilty to the misdemeanor charges if he had known information that came to light in discovery in this case.  Dkt. # 71-1, at 27.

On August 23, 2017, Dupler submitted a use of force report to the TPD providing Dupler's summary of events leading up the use of force against Morris and diagrams showing where force was used.  Dkt. # 72-12.  The report shows that officers in Dupler's chain of command reviewed Dupler's report and found that Dupler's use of force was reasonable and justified.  Id. at 10.  The report states that photographs of the area where the incident occurred and injuries sustained by First, Dupler, and Dodd were attached to the report.[3]  Id. at 9-10.  Parrish and Rodriguez are listed as witnesses to the incident, but both Parrish and Rodriguez testified in their depositions that they did not witness the physical altercation involving Morris.  Dkt. # 72-3, at 7-8; Dkt. # 72-7, at 6; Dkt. # 72-12, at 9.  The report does not contain a statement from Morris or any witness to the incident who was not a police officer.

---

[3]     The photographs were not attached to the version of the report included in the summary judgment record, but the Court will assume that the photographs were attached to the original report.

Morris filed this case in Tulsa County District Court alleging claims against the City, Chuck Jordan, Dupler, First, and Dodd. The current operative pleading is the first amended complaint (Dkt. # 28) and Chuck Jordan, the former Chief of Police for the TPD, has been dropped as a party. Morris asserts claims of assault and battery (first claim for relief) and negligence (second claim for relief) against Dupler, First, and Dodd, and he alleges that the City is vicariously liable for the same conduct. Morris alleges claims under 42 U.S.C. § 1983 against Dupler, First, and Dodd for the use of excessive force (third claim for relief) and unlawful arrest (eighth claim for relief), and he alleges § 1983 claims against the City for maintaining a custom or policy of promoting the use of excessive force (sixth claim for relief) and failure to train or supervise officers concerning the use of excessive force (seventh claim for relief). Morris also asserts negligence claims against the City for maintaining a policy that promotes the use of excessive force (fourth claim for relief) and failing to train or supervise TPD officers who have a history of using excessive force (fifth claim for relief). Defendants filed a motion to dismiss and the Court entered an opinion and order (Dkt. # 44) finding that Dupler, First, Dodd had qualified immunity from Morris' claim for unlawful arrest (eighth claim for relief). However, the Court denied the individual defendants' request to dismiss Morris' claims arising out of the alleged use of excessive force when arresting him.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

8

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

The individual defendants argue that they are entitled to qualified immunity, because Morris cannot show that his constitutional rights were violated or that his rights were clearly established when the incident giving rise to his claims occurred. Dkt. # 50, at 25-29. They also argue that the use of force was objectively reasonable under Oklahoma law, and they seek summary judgment on Morris' claim of assault and battery and negligence under state law. Id. at 30-32. The City's

primary argument in support of summary judgment is that the individual defendant's use of force was objectively reasonable, and Morris cannot prevail on claims concerning excessive force under federal or state law. Dkt. # 51, at 30-31, 35. The City also asserts that Morris has failed to show that any policy or custom of the City caused a violation of his constitutional rights. Id. at 31-34.

### A.

The individual defendants argue that the amount of force used to arrest Morris was reasonable, because Morris was actively resisting arrest and he posed a significant threat of harm to police officers on the scene. Dkt. # 50, at 28. Morris responds that he has offered evidence that he did not initiate the use of force or engage in threatening conduct, and the amount of force used by Dupler, First, and Dodd was excessive for the arrest of a person suspected of a misdemeanor offense who was not resisting arrest. Dkt. # 71, at 18-20. Morris also argues that police had no need to set up a perimeter around his barn, because they should have known the suspect was not in the barn and there was never any need for police officers to confront him.

Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. "The purpose of § 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims. Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006). The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity. A plaintiff must show that the defendant's actions violated a specific constitutional right and, if the plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred. Toevs. v. Reid, 685 F.3d 903, 909 (10th Cir. 2012). Morris bears the burden to prove that his constitutional rights were violated and that the law giving rise to his claim was clearly established at the time the acts occurred. Cox v. Glanz, 800 F.3d 1231, 1246 (10th Cir. 2015); Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).

Morris alleges that police used excessive force to effect his arrest in violation of the Fourth Amendment. Id. at 15. The Fourth Amendment governs claims concerning the use of force for a warrantless arrest before a probable cause hearing has been held. Estate of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014). In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court set out the standards governing excessive force claims under the Fourth Amendment, and as a general matter explained that the reasonableness of the force used requires a "balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396. The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight," and not "every push or shove . . . violates the Fourth Amendment." Id. The Court must consider factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to

11

the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Estate of Ceballos v. Husk, 919 F.3d 1204, 1213 (10th Cir. 2019). The reasonableness inquiry is wholly objective and "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ." McCoy v. Meyers, 887 F.3d 1034, 1045 (10th Cir. 2018). The use of force may become unreasonable, even if the use of force is initially appropriate, if the person being detained is no longer a threat to the safety of police officers. Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991).

The Court initially notes that the individual defendants have submitted affidavits to support their version of the facts, and they disregard conflicting evidence submitted by Morris or sometimes even by the affiant's own deposition testimony. Rule 56 does not authorize trial by affidavit and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255. When the Court is faced with conflicting evidence, the Court must make all reasonable inferences in favor of the non-moving party and the Court may not attempt to resolve credibility disputes presented by the evidence. Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009). Defendants argue that many of the facts stated in their motion for summary judgment are undisputed or should be deemed admitted, but many of these "undisputed" facts are based on requests to assess Morris' credibility and reject his version of the events. Dkt. # 77, at 2-5. Defendants also fault the "self-serving" nature of Morris' deposition testimony, but defendants' affidavits could be viewed as just as self-serving from plaintiff's perspective. Id. at 2. The Court will not reject evidence offered by

either party because it is potentially "self-serving," and any factual disputes or reasonable inferences from the evidence will be considered in a light most favorable to the non-moving party.

Both parties have offered conflicting versions of the events giving rise to Morris' arrest and there are few facts that can be deemed undisputed for the purpose of ruling on a motion for summary judgment. It is undisputed that multiple TPD officers were pursuing a suspect near the area of a barn located on Morris' property, but Morris has offered evidence calling into question whether Dupler, First, and Dodd could have reasonably believed that the suspect was hiding in his barn. Barnhart's dashcam video shows Barnhart and another TPD officer searching the area in and around the barn, and they gave no indication that the suspect was hiding in the barn. Dkt. # 71-5. The parties have also offered conflicting statements allegedly made by Morris' neighbor, Pourett, and it is disputed whether Pourett told Dodd that the suspect ran toward the barn. While the suspect could possibly have been hiding in the barn, Morris has offered sufficient evidence to dispute whether TPD officers have any objective or reasonable basis for this belief.

It is undisputed that several TPD officers set up a perimeter around the barn and that Morris arrived some time after the perimeter had been established. Morris does not dispute that he went toward a gate to enter a fenced area in order to calm his horse and that TPD officers were directing him to step away from the gate. Morris also does not dispute that he used obscene language toward the officers when they asked him to step away from the gate, but he does dispute defendants' characterization of their conduct as an attempt to de-escalate the situation. Morris testified that he wanted to calm his horse that was loose inside the fence and that he did not intend to go near the barn. Dkt. # 71-1, at 5. Rodriguez testified in his deposition that the horse was not in the barn when officers had set up a perimeter, and this is corroborated by the statements of First and Dodd. Dkt.

13

# 50-6, at 5; Dkt. # 50-9, at 5; Dkt. # 71-7, at 6.  This supports an inference that Morris was not headed toward the barn when he walked through the gate to calm his horse.  Defendants argue that Morris' conduct distracted them from the potential suspect in the barn, but a reasonable factfinder could question whether Morris was actually interfering with the ongoing investigation.  The Court has already established that there is disputed evidence concerning whether the officers had a reasonable belief that the suspect was in the barn, and the evidence raises a genuine dispute about whether it was necessary for police to engage with Morris as he attempted to calm his horse.

The parties dispute whether Morris or First escalated the incident by threatening to use physical force.  First states Morris became frenzied and approached First with balled fists, and First was surprised when Morris charged him while showing no intent to stop or obey orders from First.  Dkt. # 50-6, at 7.  First states that Morris had a significant size advantage over First, and First was knocked back when he put his hands on Morris' chest to move Morris toward his right side. Id.  First deployed his OC spray and the spray hit the side of Morris' face, and First states that the spray  had little effect on Morris.  Id.  First took Morris to the ground, and he claims that Morris purposefully buried his hands beneath his body.  Id. Morris disputes First's claim that he initiated the use of force, and he claims that he was complying with First's orders to step away from the gate when First lunged at him. Dkt. # 71-1, at 9.  Morris denies that he was angry at First or that his fists were balled as he approached First.  Id. at 10-11.  Morris claims that First's attempt to grab him was unsuccessful, and Morris laughed as First fell to the ground.  Id. at 15.  Morris walked back toward the gate, and he states that First used his OC spray while Morris was walking away from First.  Id. at 16.  Morris claims that he attempted to use his shirt to wipe the OC spray from his face when First took him to the ground and jumped on his back. Id. at 17-18. Morris states that he sat up on his hands and knees

and said he was "done." Id. at 18. The Court finds that parties have offered conflicting evidence concerning the circumstances causing First to initiate the use of force against Morris, and there is a genuine dispute as to whether First reasonably believed that Morris intended to assault him.

Defendants argue that the amount of force used to subdue Morris was objectively reasonable in light of Morris' resistance and the officers' belief that Morris could have been reaching for a weapon. First claims that Morris was too strong for him to control and he did not know if Morris was armed. Dkt. # 51-6, at 7-8. Dupler and Dodd arrived to assist First in his efforts to gain control over Morris' hands, and all three officers were struggling as Morris continued to resist their attempts to arrest him. Dkt. # 51-3, at 5; Dkt. # 51-6, at 8; Dkt. # 51-9, at 8. Dupler states that he struck Morris with a high level strike to the right side of the face using a closed fist, and they were able to get one handcuff on one of Morris' wrists. Dkt. # 51-3, at 6. Dupler asserts that Morris continued to resist and he refused to put his hands behind his back, and Dupler hit Morris with three or four medium velocity strikes to the back of the head. Id. Morris testified in his deposition that he did not resist the officers' attempts to take him into custody and he told First that he was "done" as soon as First took him to the ground. Dkt. # 71-1, at 18. Morris does not recall that any of the officers were issuing a command to him while he was pinned to the ground, and he claims that the officers had control of his broken left arm. Id. at 19. Morris denies that he was offering any resistance to the officers and he denies that officers asked him to put his hands behind his back. Id. Morris claims that a police officer lifted his face off the ground and struck him multiple times in the head, and he states that the officers left him choking in a pool of his own blood while they handcuffed him. Id. at 24.

15

The Court must view the evidence in a light most favorable to the non-moving party, and Morris has come forward with evidence that would permit a reasonable jury to find that his constitutional rights were violated due to the use of excessive force by First, Dupler, and Dodd to effect his arrest for a minor offense.  Defendants are essentially asking the Court to weigh the evidence, make a finding that their version of the incident is more credible, and then disregard plaintiff's deposition testimony.  However, weighing the evidence and credibility determinations are functions that are reserved for the jury and the Court must view the evidence in a light most favorable to the plaintiff.  Under the Graham factors, police suspected Morris of committing a minor offense and it is not clear that he posed any immediate danger to police officers or the public.  In fact, Morris has presented evidence suggesting the police officers needlessly set up a perimeter and they were denying him access to his own property without any reasonable basis to believe that the suspect was in the barn.  It is undisputed that Morris initially disobeyed commands to stay away from the gate leading to the fenced area, but he has come forward with evidence that First assaulted him without provocation when he attempted to comply with First's commands to step away from the gate.  Morris denies that he resisted the officers' attempts to take him into custody and he disputes that he failed to comply with any commands issued by the officers.  It is undisputed at some point in the encounter that Dupler struck Morris multiple times in the head and that Morris' left arm was broken, and Morris has come forward with evidence that he was not actively resisting arrest when force was used against him.  The Court finds that there are genuine disputes as to material facts concerning the circumstances under which Morris was taken into custody, and Morris has met his burden to come forward with evidence showing that his constitutional rights were violated by First, Dupler, and Dodd.

16

The Court must also consider whether the law giving rise to the constitutional violation is clearly established.  In the context of excessive force cases, "there will almost never be a previously published opinion involving exactly the same circumstances" due to the fact-intensive nature of these claims.  Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007).  Courts apply a sliding scale to excessive force claims "in which 'the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" Easter v. Cramer, 785 F. App'x 602, 607 (10th Cir. Sep. 19, 2019) (quoting Casey, 509 F.3d at 1284).[4]  In Morris v. Noe, 672 F.3d 1185 (10th Cir. 2012), the Tenth Circuit considered whether police could employ felony takedown procedures to arrest a suspect for a misdemeanor offense when the suspect did not immediately pose a danger to any police officer.  Id. at 1196-97.  Even though there was no case directly on point, the Tenth Circuit found that the Graham factors weighed so heavily against the use of force that a reasonable police officer would have understood that the amount of force used was not justified.  Id. at 1197.

The Court has not found a case directly on point and it is debatable whether the "sliding scale" approach to qualified immunity is still applicable under Tenth Circuit precedent.  Contreras on behalf of A.L. v. Dona Ana County Bd. of County Commissioners, ___ F.3d ___, 2020 WL 4045924 (10th Cir. July 20, 2020) (Tymkovich, J. concurring); United States v. City of Albuquerque, 2020 WL 3129825 (D.N.M. June 12, 2020).  However, the ultimate question is whether a reasonable police officer would have understood that the amount of force used was not justified.  The Supreme Court has explained that a police officer is entitled to qualified immunity unless the law would have

---

[4]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

17

been sufficiently clear to "every" reasonable official that what he was doing was unlawful, and this standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Even under this demanding standard, the Court finds that Dupler, First, and Dodd are not entitled to qualified immunity when the evidence is viewed in a light most favorable to Morris. For the purpose of deciding whether the law was clearly established, the Court will assume that Dupler, First, and Dodd could have believed that a suspect was hiding in the barn. However, Morris has come forward with evidence disputing defendants' version of the events giving rise to his arrest, and he has given deposition testimony that he was not attempting to resist arrest after First used OC spray and took him to the ground. Morris also claims that he told First that he was "done," but First, Dupler, and Dodd pinned him to the ground. Even if the Court assumed that Morris violated a command from a police officer and the officers had some basis to believe that Morris presented a threat, Morris testified in his deposition that he was not resisting arrest and his arms were accessible to police officers at this point in the encounter. It is undisputed that Dupler struck Morris multiple times in the head, and it would have been clearly unlawful for a police officer to strike an unresisting suspect multiple times in the head when the suspect was pinned to the ground by three officers. Morris acknowledges that he cannot identify a case that is directly on point, but he argues that no reasonable police officer would have used the same amount force when confronted with a person suspected of a minor offense who was offering no physical resistance to arrest. Dkt. # 71, at 23. The Court finds that any reasonable police officer would have known it was lawful to pin an unresisting suspect to the ground and strike him multiple times in the head, and the conduct was sufficiently egregious that it not necessary for Morris

to identify a case that is exactly on point in order to show that the law supporting the violation of his constitutional rights was clearly established.

Finally, the individual defendants argue that there is no possibility that plaintiff could recover punitive damages, because the use of force was objectively reasonable and no jury could reasonably find that defendants intended to violate plaintiff's constitutional rights.  To award punitive damages under § 1983, a plaintiff must ultimately show that "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Burke v. Regalado, 935 F.3d 960, 1038 (10th Cir. 2019) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Viewing the evidence in light most favorable to Morris, the Court finds that a reasonable jury could conclude that Dupler, First, and Dodd acted with recklessness or callous disregard to Morris' constitutional rights under the Fourth Amendment, and defendants' request to dispose of plaintiff's demand for punitive damages on a motion for summary judgment is denied.

## B.

The City argues that it cannot be held liable under § 1983, because the actions of the individual defendants did not violate plaintiff's constitutional rights. Dkt. # 51, at 31.  Even if the Court finds that a constitutional violation occurred, the City argues that the violation was not caused by an official policy or custom and plaintiff cannot recover against the City under § 1983.  Id. at 33.

Under § 1983, a local government or municipality may be held liable for adopting an official policy or custom causing a violation of constitutional rights, but local governments can not be sued under a respondeat superior theory of liability.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).  "To establish a claim for damages under § 1983 against municipal entities

or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." Moss v. Kopp, 559 F.3d 1155, 1168 (10th Cir. 2009).  It is not enough for a plaintiff to allege that the actions of a governmental employee injured him. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002).  "Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Seamons v. Snow, 206 F.2d 1021, 1029 (10th Cir. 2000).  One way for a plaintiff to prove a claim of municipal liability is to show that an express policy deprived the plaintiff of a constitutional right.  Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1279 (10th Cir. 2009).  Another way to establish municipal liability is to show that an action taken by a final policymaker for the governmental entity violated or caused a violation of the plaintiff's constitutional rights. Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1285 (10th Cir. 2007).

TPD has a formal use of force policy that encourages officers to use low-level force techniques, such as verbal commands and command presence, to avoid the use of physical force. Dkt. # 72-11, at 3.  However, the policy recognizes that physical force may be necessary under certain circumstances in order to discharge their duties or to defend themselves or other persons. Id. The policy includes a chart dividing the use of force into low force, intermediate force, and great force.  Low force maneuvers such as firm grip, verbal commands, or uniform presence should be used in situations involving little expectation of injury and for the purpose of obtaining compliance with officer commands.  Id.  Acts of intermediate force include physical control holds, OC spray, electronic control devices, and impact weapons.  Id.  Intermediate force can be used to overcome or

control a person in situations presenting some risk of physical injury but no expectation of great bodily injury or death.  Id.  Great force is used when it is necessary to incapacitate a person, and acts of great force will likely result in great bodily injury or death.  Id.  An officer who uses intermediate or great force must complete a use of force report describing the incident, and the report must be reviewed by the officer's chain of command.  Id.  The purpose of the review is to determine whether the officer's conduct complied with TPD's use of force policy, and the review may "identify potential training issues or areas of improvement in the officer's response . . . ."  Id.  A reviewing officer's finding that the use of force policy was violated does not automatically mean that the officer will receive a reprimand, but this can prompt additional investigations which could lead to further training or possibly disciplinary action.  Id.

In this case, Dupler submitted a use of force report containing a description of the incident by himself and First, and this description is very similar to the version offered in Dupler's and First's affidavits in this case.  Dkt. # 72-12, at 2-3.  Dupler states that he was assisting a fellow officer with an "assaultive" subject, and the report lists various types of physical resistance allegedly employed by Morris.  Id. at 4.  The report contains diagrams of the human body and areas where force was used against Morris and the types of force employed are marked.  Id. at 5-8.  Photographs of Morris' property and injuries sustained by the officers are attached to the report, but there are no photographs of Morris' injuries.  Id. at 9.  The only description of Morris' injuries is First's statement that Morris sustained a "chip" fracture of his left elbow and that Morris received stitches to repair a laceration above his right eye.  Id. at 3.  Reviewing officers found that Dupler's use of force fell within TPD's policy for the permissible use of force.  The report lists TPD Officers Parish and Rodriguez as witnesses, but there is no statement from Morris included in the report.  Id. at 9.  Pursuant to the

21

collective bargaining agreement (CBA) between the Fraternal Order of Police and the City, use of force reports are periodically removed from an officer's file if the allegations of wrongful conduct are "not sustained or unfounded," and sustained disciplinary actions are also removed after a certain period of time depending on the severity of the discipline. Dkt. # 72-13. Dupler's file contains eight file review documents suggesting that documents were removed from his file pursuant to the CBA. Dkt. # 72-13.

Morris argues that a system based on the self-reporting of use of force with no independent investigation, coupled with a policy of removing documents from an employee's file, constitutes an official policy or custom that caused the violation of his constitutional rights. He claims that investigation into use of force incidents is based solely on the "self-serving and superficial" reports submitted by officers, and he notes that several of the officer witnesses cited in Dupler's report have provided contradictory accounts of the incident as part of discovery in this case. Dupler's report lists Rodriguez and Parrish as witnesses to the use of force, but those officers testified in their depositions that they did not observe the encounter between Morris and police officers. Dkt. # 72-3, at 7-9; Dkt. # 72-7, at 6. First testified that he assumes that Dupler participated in the arrest of Morris, but he did not realize that Dupler was present until Morris was already in custody. Dkt. # 72-6. This conflicts with his statements in Dupler's use of force report that he observed Dupler deliver strikes to Morris' head and that it was necessary for Dupler to use force to prevent Morris from burying his hands under his body. Dkt. # 72-12, at 3. First testified in his deposition that he chose not to escalate the level of force by using a head or crotch strike based on his own assessment of the situation, and he declined to speak on whether it would have been reasonable for another officer to use a higher level of force. Dkt. # 72-6, at 6. Morris also argues that Dupler's report fails to mention

22

that police officers had already been through the barn before First, Dupler, and Dodd set up a perimeter around the barn, and reviewing officers were not given necessary evidence to determine whether there was any need for officers to confront Morris.  Dkt. # 72, at 21.

The Court finds that plaintiff has identified an official policy that could support a § 1983 claim against the City.  A municipal policy or custom may take the form of "(1) 'a formal regulation or policy statement'; (2) an informal custom 'amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'; (3) 'the decisions of employees with final policymaking authority'; (4) 'the ratification by such final policymakers of the decisions–and the basis for them–of subordinates to whom authority was delegated subject to these policymakers' review and approval'; or (5) the 'failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.'"  Bryson v. Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010) (quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189-90 (10th Cir. 2010)).  Plaintiff argues that the City's policy for reviewing incidents of use of force by police officers is so deficient that it fails to provide even a minimal level of supervision, and the City has shown deliberate indifference to a known risk that certain officers are likely to use excessive force in encounters with citizens.  Dkt. # 72, at 23.  Morris has chosen to rely on an alleged failure to train or supervise by the City as the official policy or custom, and this requires Morris to prove that the City acted with deliberate indifference.  The Tenth Circuit has explained that this is a stringent standard that will be met only when a municipal actor has disregarded a known or obvious consequence of his actions, because a less stringent standard would essentially constitute respondeat superior liability against a municipality.  Waller v. City and

County of Denver, 932 F.3d 1277, 1284 (10th Cir. 2019).  Deliberate indifference may be found when "the municipality has actual or constructive notice that its actions or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  Id. (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998)).  A finding of deliberate indifference must ordinarily be based on a pattern of unconstitutional behavior, and there are only a narrow range of cases in which a "violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."  Id. (quoting Barney, 143 F.3d at 1307-08).

The Court finds that Morris has not met his burden to show that the City acted with deliberate indifference to his constitutional rights.  The evidence has shown that TPD's policy for reviewing incidents of use of force is potentially one-sided in that only the perspective the police officer who used force and witnesses identified by that officer are considered.  However, Morris makes no argument that this policy is facially unconstitutional or that the policy put the City on notice that any person's constitutional rights had been violated.  The Court notes that Dupler's personnel file contains eight divisional file reviews suggesting that documents were removed and, pursuant to TPD's policy, these documents could have included evidence of prior incidents of use of force or even disciplinary actions against Dupler.  Dkt. # 72-13.  While it would have been preferable if documents had not been removed from Dupler's file, the Court will not speculate what any documents in the file might have shown and the Court will not assume that Dupler engaged in prior incidents of use of force based only on the removal of documents from his file.  Morris has not come forward with evidence establishing a prior history of use of force by any officers involved in his arrest, and there is no evidence suggesting that the City should have been on notice that allowing

Dupler, First, or Dodd to serve as police officers would result in a violation of any person's constitutional rights.

Morris argues that the incident in this case was so egregious that this fits within the narrow range of cases where a single incident provides sufficient evidence of a failure to train or supervise. Dkt. # 72, at 23.  In Waller, the Tenth Circuit found that the officer's use of force was obviously unwarranted, and the egregiousness of the conduct was such that no reasonable police officer would have thought that it was permissible to use force in the same situation.  Waller, 932 F.3d at 1288. This tended to show that it was a conscious decision by the officer to commit a violent act, rather than the use of force is a situation where additional training could have been helpful, and the municipality was not on notice of a lack of training or supervision. Id.  The Court finds that a similar line of reasoning applies in this case.  The Court has denied the individual defendants' request for qualified immunity on the ground that no reasonable police officer would have thought that it was permissible to pin an unresisting suspect to the ground and hit him multiple times in the head. Viewing the evidence in a light most favorable to Morris, the conduct of the individual defendants was so egregious that it is not likely that a lack of training or supervision contributed to the use of force, and it would have been a conscious decision of the part of the officers to use force in a situation where it was clearly not permitted.

Morris has identified aspects of TPD's policy for reviewing incidents of use force that raise questions about the objectivity of the process and whether evidence other than that provided by the officer is considered.  There is also the potential that removing documents from an officer's personnel file does not permit reviewing officers to consider prior incidents of use of force by the officer under review.  However, these issues do not raise a genuine dispute that an official policy or

custom caused a constitutional violation in this case.  The Court finds that the City is entitled to summary judgment on Morris' § 1983 claims against it.

**C.**

Defendants argue that the use of force was objectively reasonably as a matter of Oklahoma law, and they request that the Court enter summary judgment in their favor as to Morris' claims of assault and battery and negligence under Oklahoma law.  Dkt. # 50, at 30-32; Dkt. # 51, at 29-31. Morris responds that the officers' use of force was unreasonable under Oklahoma law and there are genuine disputes as to material facts that preclude the entry of his state law claims.

The Oklahoma Supreme Court has determined that a police officer who uses force to effect an arrest of a citizen is immune from civil liability for assault and battery "as long as the force is 'necessarily committed by the officer in the performance of a legal duty." Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dep't, 230 P.3d 869, 879 (Okla. 2010).  However, police officers have a duty "to use only such force in making an arrest as a reasonably prudent officer would use in light of the objective circumstances confronting the officer at the time of the arrest." Id. at 880.  The Oklahoma Supreme Court has identified seven factors for evaluating whether the amount of force used by a police officer was reasonable:

> (1) the severity of the crime of which the arrestee is suspected; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest; (4) the known character of the arrestee; (5) the existence of alternative methods of accomplishing the arrest; (6) the physical size, strength and weaponry of the officers compared to those of the suspect; and (7) the exigency of the moment.

Id.  The police officer's subjective intentions or mistakes of fact or law are irrelevant, and the inquiry into the reasonableness of the use of force is purely objective.  Id.  The standard of care takes into

26

account that making an arrest often involves a risk of harm to the person being arrested, and the use of minimal force will not subject a police officer to civil liability.  Id.

The first three Morales factors are the same as the Graham factors, which the Court has already considered in the context of Morris' § 1983 claims.  The fourth factor (knowledge about the arrestee) is neutral in this case, because there is no evidence that the officers had any prior encounters with Morris or knew anything suggesting that he posed a danger to them.  The fifth factor (alternative methods) weighs in favor of Morris' argument that police used excessive force.  Morris has produced evidence calling into question whether there was any need for police to confront him, because the suspect sought by police was likely not in the barn and Morris may not have been interfering with the ongoing investigation by attempting to calm his horse.  He also testified in his deposition that he did not attempt to physically resist arrest, and Morris claims that he told officers that he was "done."  Even if the Court assumes that Morris violated a command issued by a police officer, the evidence suggests that police could have allowed Morris to calm his horse and arrested him or issued a citation after the situation had calmed down.  As to the sixth factor (physical size and weaponry of participants), defendants have produced evidence that Morris was large and physically strong, and they argue that the police officers could reasonably have believed that Morris was armed.  However, there were three police officers present and the officers were likely carrying firearms.  The Court does not find that the evidence weighs strongly in favor of either party on this factor.  Finally, the Court must consider the exigency of the moment.  The Court has already noted that there is disputed evidence as to whether there was an imminent need for officer to confront Morris, and the evidence offered by defendants does not clearly show that Morris' conduct created a risk of harm to them.

The Court finds that Morris has come forward with evidence giving rise to a genuine dispute as to a material fact concerning the reasonableness of the force used by Dupler, First, and Dodd., and defendants' motion for summary judgment on Morris' claims of assault and battery and negligence (first and second claims for relief) should be denied.  The Court notes that the City has not specifically moved for summary judgment on Morris' negligence claims based on a custom of excessive force or failure to train, and the City has chosen to challenge Morris' state law claims under a theory that Dupler, First, and Dodd did not use excessive force.  Although the Court has granted the City's motion for summary judgment as to Morris' § 1983 claims as to municipal liability, that ruling was based on the stringent federal standard of deliberate indifference, and the City has offered no argument as to the standard applicable under Oklahoma law for negligence claims based on the same conduct.  The City made a deliberate choice to challenge Morris' tort claims based on the alleged reasonableness of the amount of force used by police officers to arrest Morris, and Morris' negligence claims against the City based on a custom of excessive force and failure to supervise (fourth and fifth claims for relief) remain pending.

**IT IS THEREFORE ORDERED** that Defendants Joshua Dupler's, Anthony First's, and Kurt Dodd's Motion for Summary Judgment and Brief in Support (Dkt. # 50) is **denied**.

**IT IS FURTHER ORDERED** that Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support (Dkt. # 51) is **granted in part and denied in part**: the motion is granted as to Morris' § 1983 claims against the City (sixth and seventh claims for relief), but the motion is denied in all other respects.

Claims for relief one through five remain pending for trial.

**DATED** this 29th day of July, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE